Argued December 22, 1978, modified and remanded January 29, reconsideration denied February 27, petition for review denied March 13, 1979

BEECROFT et ux, *Appellants,*

*v.*

DOUGLAS COUNTY et al, *Respondents.*

(TC 76-0526, CA 10627)

589 P2d 1188

Paul D. Clayton, of Luvaas, Cobb, Richards & Fraser, P. C., Eugene, argued the cause and filed briefs for appellants.

Edward P. Fitch, Deputy District Attorney for Douglas County, argued the cause for respondent

Douglas County. On the brief was Paul Nolte, County Counsel, Roseburg.

Donald S. Kelley, of Luoma, Kelley & Wolke, Roseburg, argued the cause and filed a brief for respondent City of Sutherlin.

Before Schwab, Chief Judge, Gillette and Roberts, Judges, and Holman, Judge Pro Tempore.

HOLMAN, J. Pro Tempore.

**HOLMAN, J.,** Pro Tempore.

This is a suit against Douglas County and the City of Sutherlin for the specific performance of a contract to construct a street upon plaintiffs' property. Plaintiffs appeal from a decree for defendants.

East Central Avenue in the City of Sutherlin is also Douglas County Road No. 19. In January of 1970 the city and county entered into an agreement for the development and widening of East Central Avenue. The agreement provided, in part, as follows:

"* * * * *.

"A. County shall undertake the improvements of Central Avenue and shall do the following:

"1. Cause to be constructed a city street section * * *.

"* * * * *.

"4. County shall furnish deed description and appraisal information for City's use in right of way acquisition.

"5. County shall assume all costs of rights of way, * * *.

"B. City shall participate in the costs of construction to the following extent and shall otherwise perform the following:

"* * * * *.

"3. City shall perform all rights of way negotiation and shall obtain options in the name of the City. All options shall be approved by the Douglas County Board of Commissioners.

"* * * * *."

The then city manager, Mr. Stubbert, undertook to fulfill the city's obligation under the agreement to secure options for the property needed for the street widening. Plaintiffs owned property upon the street and Stubbert called upon them to secure an option for the necessary 15-foot strip across the front of plaintiffs' property. The offer for the property was unsatisfactory to plaintiffs but they told Stubbert that if the county would grade and rock a new street down the

side of plaintiffs' property 60 feet wide and approximately 1300 feet in length which would intersect East Central Avenue, plaintiffs would not only give them the property needed for widening East Central Avenue but also the land upon which to construct the new street. Stubbert told plaintiffs that they had to receive the assent of the county for such an arrangement before he could agree to it and that he would see if it was possible. He subsequently returned and told them the arrangement was agreeable and he prepared and had them sign an option which, if exercised, provided for an agreement in conformance with plaintiffs' proposal.

Because of the involved complications resulting from two governmental agencies and numerous property owners, it was approximately a year later, about March 1, 1971, before Stubbert returned with a deed drawn by the county for the exercise of the option, but which, in conformance with the city-county agreement, ran in favor of the city. The deed was executed by plaintiffs and about two years later East Central Avenue was widened by using the 15-foot strip of plaintiffs' property. Plaintiffs assumed that the deed, which was a long metes and bounds description, provided for not only the 15-foot strip but also the 60-foot street down the side of their property. In fact, it provided for only the 15-foot strip.[1] When the street curbs were installed on East Central Avenue, plaintiffs noticed that no provision had been made in the curb for the entrance of the new street promised them. Thereupon, Mrs. Beecroft went to the city manager, now a Mr. Schoolfield, and inquired about the construction of the new street. Mr. Schoolfield knew nothing of the new street, but, upon looking at the files, he said the city had forgotten to put it in. When asked what the city was going to do about it, he said the curbs were already in, the city had no equipment to remove them and the construction would have to wait

---

[1]The Beecrofts tendered a deed to the city for the 60-foot strip as soon as they learned it was not included in the original deed.

until they had a street project. Then they would bring in the necessary equipment and build the street.

Time passed and about a year later Mrs. Beecroft returned and asked the then city manager, now a Mr. Nordby, about the matter. She was told that he knew nothing about any such arrangement, that he would have to investigate, and that she should come back after he had had such an opportunity. A few days later Mrs. Beecroft returned and Nordby told her that they would build a road but they did not have the money to do it and that when a budget was approved with the money in it the street would be put in. Some time later Mrs. Beecroft returned again and was told that the plans for the street were not prepared yet and that the city manager was out of town. After other contacts she was eventually told by Nordby that the city had made a bad deal and that the street was low on his list of priorities. This proceeding was then instituted. The above information of the contacts with Nordby was contradicted in numerous respects by Nordby's testimony, but his testimony was nebulous and punctuated many times with "I don't remember." Mrs. Beecroft's testimony was by far the more credible.

There is no dispute but that the option was taken by Stubbert for the benefit of defendants, that it was exercised by him for defendants who received the benefit of the agreement, that the agreement was performed by plaintiffs, and that defendants have given no consideration for such performance. Defendants' principal defense is that the entire transaction was contingent upon the approval of the county commission, which was to furnish the consideration for the transfer, and that it was approved neither by the county commission nor by the city council. They contend that plaintiffs' remedy is by way of inverse condemnation for the value of the 15-foot strip of property actually taken. It is true that plaintiffs were told and the option provided that the arrangement had to have the approval of the county commission. There is no record of the county commission's ever having

approved this particular transaction, although many others were so approved. County procedure was for the options to be presented to the commission and, if they were approved, they were passed on to the public works department for the drawing of the deeds and the disbursement of the money in payment for the property. There was testimony by county employees that the Beecroft option was discussed informally with the commission but was never presented for consideration at a formal commission meeting because the commissioners did not want to approve it. No one at the county level could account for the fact that the deed was taken and the property used without such approval.

However, the evidence suggests how it probably occurred. Options were about to expire which had been taken on property to be used in widening the street and time was critical for their exercise. There were other property owners who had not given any options because they would not accept the amount the county was willing to pay. The city had what it considered a good arrangement with the county and did not want it to come to naught or to be delayed because of the county's refusal to pay the full sums demanded by the property owners. It became customary in such cases for the city to agree with the county that it would pay the excess demanded by the property owner over what the county was willing to pay. The city was short of funds with which to make these excess payments. On December 15, 1970, the following letter was written by the county supervisor of real property to Mr. Stubbert, the city manager who was making the arrangements with the property owners:

> "Pursuant to our meeting on December 4, 1970 the Board of County Commissioners have taken under advisement the matter of a loan of funds to the City for acquisition of right of way. Their decision was given to me this morning.
>
> "If you will look at the summary sheet we prepared and left with you as a guide, it was decided not to lend the sums in the left column. You may, however, assume that *the County will allow the sums in the extreme right*

*column.* Any sums on options you obtained from Lee and Himelwright exceeding the figures in the right hand column will not be allowed by the County. Am enclosing another summary sheet.

"Please call me Thursday if you have any questions." (Emphasis added.)

In the right-hand column of this document in the list of funds the county would allow was listed the sum of $435 for payment for the Beecroft property which was the amount for which it had been appraised by an independent appraiser hired by the county. Apparently this letter sparked a reaction from the city because on December 21 the following appears in the minutes of a city council meeting:

"City Manager Stubbert: * * *.

"Last year in November we began to prepare options on East Central. Most of these options will expire in January 1971. These (sic) are a couple that we have lost already.

"The County will not pay for the special damages done to certain property that the people are asking for. When the County originally instructed me to obtain these options the price was .30 per square ft. for commercial property and .10 a sq. ft. for residential property. Most of the property on Central Avenue is commercial property. Lots of the people have extra items they feel they wanted for damages and for lose (sic) of certain parts of their property in addition to the money. The City would have to pay between $10,000 - $15,000 in addition to what the county would pay. When I first talked to the Commissioners on this they wanted no part of it. But they finally came around to agree to advance the City the full amount to obtain the land, and the City would pay it back in the next budget year that amount over the appraised price. They have, however, asked for a letter requesting this procedure be taken between the County and City.

"Mayor Dr. Rapp: 'Will we be able to let the street paving program go this coming year to use this money for East Central instead?' City Manager Stubbert: 'I don't know if you would want to use that money for this project.'

[ 263 ]

Councilman Hensley: 'This should be over and above that.' Councilman Linton: 'That's right.'

"City Manager Stubbert: 'The County is installing a $75,000 storm system for this particular area. This is an item the City would never be able to afford to accomplish.' The Commissioners did state that $15,000 is a very inexpensive street for the city. This appraisal is almost one year old from the time that Shirley and I obtained the options.'

"Motion was made by Councilman Hensley instructing the City Manager to write a letter to the Commissioners requesting them for the full amount of the options, *with the city paying that amount over the appraised price* after July 1, 1971. Motion was seconded by Councilman Linton. Motion carried." (Emphasis added.)

If the city council was aware at this time of the condition concerning the new street in the option given by plaintiffs, the above set-forth approval would demonstrate an approval of the execution of the option and an acceptance of the condition and an intention on behalf of the council to comply therewith.

On December 23 Stubbert wrote the letter authorized by the council, which was as follows:

"Gentlemen:

"On Friday, December 18th, I discussed with you the East Central Sutherlin-Nonpariel No. 19 Road pertaining to the real estate options that I had obtained in the name of the City *for right-of-ways from the Union Oil Bulk Plant to St. Johns Street.*

"During this meeting it was agreed upon that I should contact the City Council in verifying that *they would agree to pay that amount over and above the appraised price as the City's share for obtaining easements and rights-of-way.* It was agreed the County would pay the entire amount to the City at this time, *with the City agreeing to pay the difference between the options and the appraised price* as prepared by Bob Kishael in the amount of $8,551.00.

"A special Council Meeting was held Monday, December 21st, at which time the Council agreed to the above arrangement.

"Since the options were dated with expiration dates in January I would appreciate all you can do to *expedite the* funds and *deed descriptions that I need in order to complete these transactions* prior to their expiration. Some have already expired and several more will be expiring in January. A considerable amount of work has gone into obtaining these options and to get new options may be difficult.

"Because there has been so much talk about this project and the need for it in Sutherlin I would hate to see any embarrassment brought about because we are unable to expedite this project this coming year.

"Thank you and we appreciate your continued cooperation." (Emphasis added.)

The Beecroft property lay between the Union Oil Bulk Plant and St. Johns Street, the area mentioned in the above letter. In the minutes of the city council for January 11, 1971, a copy of this letter is reproduced followed by

"City Manager Stubbert: 'We received $29,608.15 from the County for this project. *They are preparing the deeds and we should receive them tomorrow.* Some of the options have expired. Mr. Sanders was one that expired, but he has signed a new option.' " (Emphasis added.)

The following then appears in the minutes of the city council for the date of February 8, 1971:

"City Manager Stubbert: '*We have all deeds signed on the south side of East Central* with the exception of the Assembly of God Church. * * *.' " (Emphasis added.)

The Beecroft property is on the south side of East Central Avenue.

From the above it appears that pursuant to the transactions recorded in the documents, the original agreement between the county and the city was amended with the approval of both the county commission and the city council. Instead of the county paying the entire cost of the rights-of-way, the city agreed to pay that part of the cost of the rights-of-way above that which the county was willing to pay. The part which the city was to pay was advanced by the county

as a loan to the city which was to repay it from its next budget. The county was only willing to pay $435 for the Beecroft property and assumed the city was going to incur whatever additional obligation was necessary to satisfy the Beecrofts. It therefore prepared the deed on the Beecroft property along with all of the others and sent it to Stubbert who had it signed. [2] There is no indication that any of the $29,608.15 paid the city by the county included any money for the Beecrofts except the sum of $435. The only evidence inconsistent with the above analysis as to what actually occurred is that the Beecroft deed purports to be signed and acknowledged by Stubbert on March 1 which was after the February 8, 1971, date when the minutes of the city council meeting show that Stubbert had the deeds to all the property on the south side of the street. However, we do not place much faith in the purported date of the deed in circumstances in which signatures on many deeds are simultaneously being gathered.

Despite the city council's apparent assent to the above procedure, as demonstrated by their minutes, the city contends there is no evidence of specific approval by the council of the deal which Stubbert made with the plaintiffs for building the new street or that the transaction was ever specifically called to the council's attention so that it could give it approval actual or tacit. One of the witnesses was the city recorder who was present with Stubbert when the transaction was originally proposed by plaintiffs to Stubbert. Plaintiffs came to her at least twice when they were trying to find out why the new street was not being constructed on their property. Each time she referred them to the then city manager and found the file so he could familiarize himself with it. During the interim between the tenure of Schoolfield and Nordby as city manager, she had been responsible for making

---

[2] Mrs. Beecroft testified that at the time the deed was signed, Stubbert took it from a stack of what appeared to be other deeds which he had with him.

up the city's budget. Being aware of the transaction with plaintiffs and believing that the city had the responsibility for building the street, she testified she inserted within the budget an item of $2,500 for that purpose. She said that at the time the budget was presented to the budget committee she explained that the funds were for the construction of the street for the Beecrofts. This evidence was uncontradicted. All of the members of the city council were on the budget committee. The budget was approved by the committee and it also gained final approval. However, the funds were never spent toward construction of the street.[3]

There was no evidence of objection by the members of the city council to the inclusion of the item in the budget for the construction of the new street and this demonstrates that at the time the council authorized and accepted the obligation for the excess cost of acquiring land for the widening of East Central Avenue, it was aware of and accepted the obligation to install the new street. Otherwise, the council members would never have allowed and authorized the inclusion of the item for this purpose in the budget. The members of the city council were conspicuous by their absence from the witness stand. No city councilman testified, and, more specifically, no city councilman testified that he or she knew nothing of the agreement to build the street or that they did not intend to ratify[4] the transaction when they voted to assume the cost of

[3] She also testified that she had had a conversation with Nordby after he became city manager and after he had talked to Mrs. Beecroft. In this conversation he indicated that if the matter was sufficiently delayed, the statute of limitations would run.

[4] The city contends plaintiffs did not plead ratification. Plaintiffs alleged: "* * * The defendant Douglas County * * * for the defendant City of Sutherlin, did exercise such option on or about March 1, 1971, and plaintiffs executed and delivered their warranty deed * * * to the defendant City of Sutherlin * * *. Said deed was recorded April 21, 1971. By such act of acceptance and by constructing improvements on such * * * the defendants ratified and approved * * *."

[ 267 ]

land acquisition above that which the county was willing to pay.[5]

We come to the conclusion, therefore, that the city council had knowledge of, accepted and approved the contract with the Beecrofts for construction of the street. It may well be that the council was misled concerning the cost for which it was obligating itself. The testimony at trial indicated it would now cost much, much more than would seem to be reasonable as payment for the property taken to widen East Central Avenue.[6] However, the trial was approximately eight years after the option was taken and almost seven years after the city council approved the obligation. The intervening period was one of great inflation. This is just one of the penalties of the city's avoidance of its legal obligation.[7]

The decree of the trial court is modified and the case is remanded for the purpose of entering a decree requiring the city of Sutherlin to comply with its obligations to construct a street in conformance with the provisions of the option.

---

[5]The city also contends that new streets have to be approved by the city planning commission and refer us to city ordinance 232. It claims that any approval without the previous approval of the planning commission would be *ultra vires*. This ordinance provides for subdivision standards and procedures. Plaintiffs are not applying for approval of a subdivision and the ordinance is inapplicable.

[6]The testimony indicates that at the time the option was secured and approved by the city, city manager Stubbert contemplated using the excavated material from the improvement of East Central Avenue as fill for the Beecrofts' street which would have been a saving both in the cost of the improvement of East Central Avenue and the cost of construction of the new street. By the time East Central Avenue was improved by the county, Stubbert had taken a position as city manager for a much larger city and, apparently, no one carried through on his plan.

[7]The city pleads laches on the part of plaintiffs. We do not believe the evidence justifies its application because of the action of the city officials in dealing with the Beecrofts' inquiries concerning why their contract had not been honored.

The city also contends that plaintiffs have an adequate remedy at law because they have the right of inverse condemnation. Inverse condemnation is not an adequate remedy because it does not give plaintiffs the benefit of their bargain.